**FITZGERALD JOSEPH LLP**
JACK FITZGERALD (SBN 257370)
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH (SBN 287057)
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER (SBN 275423)
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| BRANDON JOHNSON-JACK and MICHAEL XAVIER, on behalf of themselves, all others similarly situated, and the general public, | Case No: 3:21-cv-7895 |
|  | <u>CLASS ACTION</u> |
| Plaintiffs, | **COMPLAINT FOR VIOLATIONS OF:** |
| v. | **CAL. BUS. & PROF. CODE §§17200 *et seq.*;** |
|  | **CAL. BUS. & PROF. CODE §§17500 *et seq.*;** |
| HEALTH-ADE LLC, | **CAL. CIV. CODE §§ 1750 *et seq.*; and** |
| Defendant. | **BREACH OF EXPRESS & IMPLIED WARRANTIES** |
|  | <u>DEMAND FOR JURY TRIAL</u> |

Plaintiffs Brandon Johnson-Jack and Michael Xavier, on behalf of themselves, all others similarly situated, and the general public, by and through their undersigned counsel, hereby sue Defendant Health-Ade LLC, and allege the following upon their own knowledge, or where they lack personal knowledge, upon information and belief, including the investigation of their counsel.

## INTRODUCTION

1.  For several years, Defendant Health-Ade LLC has marketed and sold a line of kombucha[1] or kombucha-inspired beverages branded as "Health-Ade" (the "Health-Ade Beverages").[2] By branding the products in this manner, Defendant expressly represents that the Health-Ade Beverages will aid health, *i.e.*, are beneficial to health when consumed. Because the Health-Ade Beverages contain a high amount of added sugar, however, Defendant's representations are false and misleading, since consuming beverages sweetened with high amounts of added sugar, like the Health-Ade Beverages, increases the risk of metabolic disease, cardiovascular disease, type 2 diabetes, and liver disease, and is further associated with increased all-cause mortality.

2.  Plaintiffs bring this action against Defendant on behalf of themselves, similarly-situated Class Members, and the general public to enjoin Defendant from deceptively marketing the Health-Ade Beverages, and to recover compensation for injured Class Members.

## JURISDICTION & VENUE

3.  This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (The Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from Defendant. In addition, more than two-thirds of the members of the class reside in states other than the state in which Health-Ade LLC is a citizen and in which this case is filed, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

4.  The Court has personal jurisdiction over Defendant because it is incorporated and headquartered in California and it has purposely availed itself of the benefits and privileges of conducting

---

[1] Kombucha is a drink produced by fermenting sweet tea with a culture of yeast and bacteria.

[2] This includes all flavors of Health-Ade Kombucha, Health-Ade Plus, Health-Ade Booch Pop, Health-Ade pop, and Health-Ade Mixers.

business activities within California, including by distributing and selling the Health-Ade Beverages in California.

5. Venue is proper in this Northern District of California pursuant to 28 U.S.C. § 1391(b) and (c), because Defendant resides (*i.e.*, is subject to personal jurisdiction) in this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## INTRADISTRICT ASSIGNMENT

6. This civil action arises out of the acts and omissions of Defendant, which occurred in San Francisco County. Pursuant to Civil Local Rule 3-2(c), (d), this action is correctly assigned to the San Francisco or Oakland Division.

## PARTIES

7. Plaintiff Brandon Johnson-Jack is a resident of California.

8. Plaintiff Michael Xavier is a resident of California.

9. Defendant Health-Ade LLC is a California limited liability corporation with its principal place of business in Torrance, California.

## FACTS

I. **DEFENDANT MARKETS THE HEALTH-ADE BEVERAGES AS HEALTHY**

10. Defendant Health-Ade LLC was founded in 2012. It sells a line of kombucha drinks, which are made from tea, water, sugar, and a culture of yeast and bacteria for fermentation.

11. As Defendant is well aware, consumers prefer healthful foods and are willing to pay more for, or purchase more often, products marketed and labeled as healthy. For instance, a Nielsen 2015 Global Health & Wellness Survey found that "88% of those polled are willing to pay more for healthier foods."[3]

12. During the Class Period and continuing today, Defendant prominently labeled and continues to label the Health-Ade Beverages with the claim, "Health-Ade," which expressly conveys the message that the Health-Ade Beverages are healthy (or aid health).

13. Defendant's branding and marketing the Health-Ade Beverages in this manner has helped the products become the fastest-selling kombucha in America.

---

[3] Nancy Gagliardi, "Consumers Want Healthy Foods--And Will Pay More For Them," *Forbes* (Feb. 18, 2015) (citing Neilson, Global Health & Wellness Survey, at 11 (Jan. 2015)).

14.    Exemplars of the Health-Ade Beverages' labeling are shown below.

**Health-Ade Kombucha**



**Health-Ade Plus**



**Health-Ade Booch Pop**



**Health-Ade pop**



**Health-Ade Mixers**



4

## II. SCIENTIFIC EVIDENCE DEMONSTRATES THAT CONSUMING SUGAR-SWEETENED BEVERAGES, LIKE THE HEALTH-ADE BEVERAGES, IS UNHEALTHY

### A. Sugar-Sweetened Beverage Consumption is Associated with Increased Risk of Metabolic Disease

15.     Excess added sugar consumption leads to metabolic syndrome by stressing and damaging crucial organs, including the pancreas and liver. When the pancreas, which produces insulin, becomes overworked, it can fail to regulate blood sugar properly. Large doses of fructose can overwhelm the liver, which metabolizes fructose. In the process, the liver will convert excess fructose to fat, which is stored in the liver and released into the bloodstream. This process contributes to key elements of metabolic syndrome, including high blood fats and triglycerides, high cholesterol, high blood pressure, and extra body fat, especially in the belly.[4]

16.     Metabolic disease has been linked to type 2 diabetes, cardiovascular disease, obesity, polycystic ovary syndrome, nonalcoholic fatty liver disease, and chronic kidney disease, and is defined as the presence of any three of the following:

a.      Large waist size (35" or more for women, 40" or more for men);

b.      High triglycerides (150mg/dL or higher, or use of cholesterol medication);

c.      High total cholesterol, or HDL levels under 50mg/dL for women, and 40 mg for men;

d.      High blood pressure (135/85 mm or higher); or

e.      High blood sugar (100mg/dL or higher).

17.     More generally, "metabolic abnormalities that are typical of the so-called metabolic syndrome . . . includ[e] insulin resistance, impaired glucose tolerance, high concentrations of circulating triacylglycerols, low concentrations of HDLs, and high concentrations of small, dense LDLs."[5]

18.     Fifty-six million Americans have metabolic syndrome, or about 22.9% over the age of 20, placing them at higher risk for chronic disease.

---

[4] Te Morenga, L., et al., "Dietary sugars and body weight: systematic review and meta-analyses of randomized controlled trials and cohort studies," *BJM* (January 2013) [hereinafter, "Te Morenga, Dietary Sugars & Body Weight"].

[5] Fried, S.K., "Sugars, hypertriglyceridemia, and cardiovascular disease," *American Journal of Clinical Nutrition*, Vol. 78 (suppl.), 873S-80S, at 873S (2003) [hereinafter, "Fried, Hypertriglyceridemia"].

19.     In 2010, Harvard researchers published a meta-analysis of three studies, involving 19,431 participants, concerning the effect of consuming sugar-sweetened beverages on risk for metabolic syndrome. They found participants in the highest quantile of 1-2 servings per day had an average 20% greater risk of developing metabolic syndrome than did those in the lowest quantile of less than 1 serving per day, showing "a clear link between SSB consumption and risk of metabolic syndrome . . . ."[6]

20.     Researchers who studied the incidence of metabolic syndrome and its components in relation to soft drink consumption in more than 6,000 participants in the Framingham Heart Study found that individuals who consumed 1 or more soft drinks per day had a 48% higher prevalence of metabolic syndrome than infrequent consumers, those who drank less than 1 soft drink per day. In addition, the frequent-consumer group had a 44% higher risk of developing metabolic syndrome.[7]

**B.     Sugar-Sweetened Beverage Consumption is Associated with Increased Risk of Cardiovascular Heart Disease**

21.     Heart disease is the number one killer in the United States. The scientific literature demonstrates that consumption of sugar-sweetened beverages has deleterious effects on heart health.

22.     In a study published in January 2020, researchers set out to determine whether consumption of Sugar containing beverages (SCBs) is associated with cardiometabolic risk (CMR) in preschool children, using 2007-2018 data from TARGet Kids!, a primary-care, practice-based research network in Canada. After adjusting for sociodemographic, familial, and child-related covariates, higher consumption of sugar-containing beverages was significantly associated with elevated CMR scores, including lower HDL "good" cholesterol, and higher triglycerides. In addition, when examined separately, juice specifically was significantly associated with lower HDL cholesterol. The researchers stated that their "findings support

---

[6] Malik, Vasanti S., et al., "Sugar-Sweetened Beverages and Risk of Metabolic Syndrome and Type 2 Diabetes," *Diabetes Care*, Vol. 33, No. 11, 2477-83, at 2477, 2480-81 (Nov. 2010) [hereinafter "Malik, 2010 Meta-Analysis"].

[7] Dhingra, R., et al., "Soft Drink Consumption and Risk of Developing Cardiometabolic Risk Factors and the Metabolic Syndrome in Middle-Aged Adults in the Community," *Circulation*, Vol. 116, 480-88 (2007) [hereinafter "Dhingra, Cardiometabolic Risk"].

recommendations to limit overall intake of SCB in early childhood, in [an] effort to reduce the potential long-term burden of CMR."[8]

23.    But consumption of sugar-sweetened beverages does not just detrimentally affect children. Analyzing data from the Danish Diet, Cancer and Health cohort study, representing 57,053 men and women aged 50 to 64 years old, researchers found "a tendency towards a lower risk of ACS [acute coronary syndrome] . . . for both men and women with higher [whole] fruit and vegetable consumption," but "a higher risk . . . among women with higher fruit juice intake[.]"[9]

24.    In one study, those who consumed juice daily, rather than rarely or occasionally, had significantly higher central systolic blood pressure, a risk factor for cardiovascular disease, even after adjusting for age, height, weight, mean arterial pressure, heart rate, and treatment for lipids and hypertension.[10]

25.    Data obtained from NHANES surveys during the periods of 1988-1994, 1999-2004, and 2005-2010—after adjusting for a wide variety of other factors—demonstrate that those who consumed 10% - 24.9% of their calories from added sugar had a 30% greater risk of cardiovascular disease (CVD) mortality than those who consumed 5% or less of their calories from added sugar. In addition, those who consumed 25% or more of their calories from added sugar had an average 275% greater risk of CVD mortality than those who consumed less than 5% of calories from added sugar. Similarly, when compared to those who consumed approximately 8% of calories from added sugar, participants who consumed approximately 17% - 21% (the 4th quintile) of calories from added sugar had a 38% higher risk of CVD mortality, while the relative risk was more than double for those who consumed 21% or more of calories from added sugar (the

---

[8] Eny, KM, et al., "Sugar-containing beverage consumption and cardiometabolic risk in preschool children." *Prev. Med. Reports* 17 (Jan. 14, 2020).

[9] Hansen, L., et al., "Fruit and vegetable intake and risk of acute coronary syndrome." *British J. of Nutr.*, Vol. 104, p. 248-55 (2010).

[10] Pase, M.P., et al., "Habitual intake of fruit juice predicts central blood pressure." *Appetite*, Vol. 84, p. 658-72 (2015).

*Johnson-Jack v. Health-Ade, LLC*
CLASS ACTION COMPLAINT



Figure 1. Adjusted Hazard Ratio (HR) of the Usual Percentage of Calories From Added Sugar for Cardiovascular Disease Mortality Among US Adults 20 Years or Older: National Health and Nutrition Examination Survey Linked Mortality Files, 1988-2006

Histogram of the distribution of usual percentage of calories from added sugar in the population. Lines show the adjusted HRs from Cox models. Midvalue of quintile 1 (7.4%) was the reference standard. The model was adjusted for age, sex, race/ethnicity, educational attainment, smoking status, alcohol consumption, physical activity level, family history of cardiovascular disease, antihypertensive medication use, Healthy Eating Index score, body mass index, systolic blood pressure, total serum cholesterol, and total calories. Solid line indicates point estimates; dashed lines indicate 95% CIs.

26.     The NHANES analysis also found "a significant association between sugar-sweetened beverage consumption and risk of CVD mortality," with an average 29% greater risk of CVD mortality "when comparing participants who consumed 7 or more servings/wk (360 mL per serving) with those who consumed 1 serving/wk or less . . . ."[12] The study concluded that "most US adults consume more added sugar than is recommended for a healthy diet. A higher percentage of calories from added sugar is associated with significantly increased risk of CVD mortality. In addition, regular consumption of sugar-sweetened beverages is associated with elevated CVD mortality."[13]

27.     Data from the Nurses' Health Study consistently showed that, after adjusting for other unhealthy lifestyle factors, those who consumed two or more sugar-sweetened beverages per day (280

---

[11] Yang, Quanhe, et al., "Added Sugar Intake and Cardiovascular Diseases Mortality Among US Adults," *JAMA*, at E4-5 (pub. online, Feb. 3, 2014).

[12] *Id.* at E6.

[13] *Id.* at E8.

calories, or 70 grams of sugar or more) had a 35% greater risk of coronary heart disease compared with infrequent consumers.[14]

28.     In another prospective cohort study, it was suggested that reducing sugar consumption in liquids is highly recommended to prevent CHD. Consumption of sugary beverages was significantly shown to increase risk of CHD, as well as adverse changes in some blood lipids, inflammatory factors, and leptin.[15]

29.     Sugar-sweetened beverage consumption is also associated with several CHD risk factors. For example, consumption of sugary beverages has been associated with dyslipidemia,[16] obesity,[17] and increased blood pressure.[18]

**C.     Sugar-Sweetened Beverage Consumption is Associated with Increased Risk of Type 2 Diabetes**

30.     Diabetes affects 25.8 million Americans, and can cause kidney failure, lower-limb amputation, and blindness. In addition, diabetes doubles the risk of colon and pancreatic cancers and is strongly associated with coronary artery disease and Alzheimer's disease.[19]

---

[14] Fung, T.T., et al., "Sweetened beverage consumption and risk of coronary heart disease in women." *Am. J. of Clin. Nutr.*, Vol. 89, pp. 1037-42 (Feb. 2009).

[15] Koning, L.D., et al., "Sweetened Beverage Consumption, Incident Coronary Heart Disease, and Biomarkers of Risk in Men." *Circulation*, Vol. 125, pp. 1735-41 (2012).

[16] Elliott S.S., et al., "Fructose, weight gain, and the insulin resistance syndrome." *Am. J. Clin. Nutr.*, Vol. 76, No. 5, pp. 911-22 (2002).

[17] Faith, M.S., et al., "Fruit Juice Intake Predicts Increased Adiposity Gain in Children From Low-Income Families: Weight Status-by-Environment Interaction." *Pediatrics*, Vol. 118 (2006) ("Among children who were initially either at risk for overweight or overweight, increased fruit juice intake was associated with excess adiposity gain, whereas parental offerings of whole fruits were associated with reduced adiposity gain."); Schulze, M.B, et al., "Sugar-Sweetened Beverages, Weight Gain, and Incidence of Type 2 Diabetes in Young and Middle-Aged Women." *JAMA*, Vol. 292, No. 8, pp. 927-34 (2004); Ludwig, D.S., et al., "Relation between consumption of sugar-sweetened drinks and childhood obesity: a prospective, observational analysis." *Lancet*, Vol. 257, pp. 505-508 (2001); Dennison, B.A., et al., "Excess fruit juice consumption by preschool-aged children is associated with short stature and obesity." *Pediatrics*, Vol. 99, pp. 15-22 (1997).

[18] Hoare, E., et al., "Sugar- and Intense-Sweetened Drinks in Australia: A Systematic Review on Cardiometabolic Risk." *Nutrients*, Vol. 9, No. 10 (2017).

[19] Aranceta Bartrina, J. et al., "Association between sucrose intake and cancer: a review of the evidence," *Nutrición Hospitalaria*, Vol. 28 (Suppl. 4), 95-105 (2013); Garcia-Jimenez, C., "A new link between diabetes

9

31.     In 2010, Harvard researchers performed a meta-analysis of 8 studies concerning sugar-sweetened beverage consumption and risk of type 2 diabetes, involving a total of 310,819 participants. They concluded that individuals in the highest quantile of SSB intake had an average 26% greater risk of developing type 2 diabetes than those in the lowest quantile.[20] Moreover, "larger studies with longer durations of follow-up tended to show stronger associations."[21] Thus, the meta-analysis showed "a clear link between SSB consumption and risk of . . . type 2 diabetes."[22]

32.     An analysis of data for more than 50,000 women from the Nurses' Health Study,[23] during two 4-year periods (1991-1995 and 1995-1999), showed, after adjusting for confounding factors, that women who consumed 1 or more sugar-sweetened soft drink per day (*i.e.*, 140-150 calories and 35-37.5 grams of sugar), had an 83% greater relative risk of type 2 diabetes compared with those who consumed less than 1 such beverage per month, and women who consumed 1 or more fruit punch drinks per day had a 100% greater relative risk of type 2 diabetes.[24] The result of this analysis shows a statistically significant linear trend with increasing sugar consumption.[25]

---

and cancer: enhanced WNT/beta-catenin signaling by high glucose," *Journal of Molecular Endocrinology*, Vol. 52, No. 1 (2014); Linden, G.J., "All-cause mortality and periodontitis in 60-70-year-old men: a prospective cohort study," *Journal of Clinical Periodontal*, Vol. 39, No. 1, 940-46 (Oct. 2012).

[20] Malik, 2010 Meta-Analysis, *supra* n.6 at 2477, 2480.

[21] *Id.* at 2481.

[22] *Id.*

[23] The Nurses' Health Study was established at Harvard in 1976, and the Nurses' Health Study II, in 1989. Both are long-term epidemiological studies conducted on women's health. The study followed 121,700 female registered nurses since 1976, and 116,000 female nurses since 1989, to assess risk factors for cancer, diabetes, and cardiovascular disease. The Nurses' Health Studies are among the largest investigations into risk factors for major chronic disease in women ever conducted. *See generally* "The Nurses' Health Study," *at* http://www.channing.harvard.edu/nhs.

[24] Schulze, M.B., et al., "Sugar-Sweetened Beverages, Weight Gain, and Incidence of Type 2 Diabetes in Young and Middle-Aged Women," *Journal of the American Medical Association*, Vol. 292, No. 8, 927-34 (Aug. 25, 2004) [hereinafter "Schulze, Diabetes in Young & Middle-Aged Women"].

[25] Hu, F.B., et al., "Sugar-sweetened beverages and risk of obesity and type 2 diabetes: Epidemioligic evidence," *Physiology & Behavior*, Vol. 100, 47-54 (2010).



**Fig. 4.** Multivariate relative risks (RRs) of type 2 diabetes according to sugar-sweetened soft drink consumption in the Nurses' Health Study II 1991–1999 (Multivariate RRs were adjusted for age, alcohol (0, 0.1–4.9, 5.0–9.9, 10+ g/d), physical activity (quintiles), family history of diabetes, smoking (never, past, current), postmenopausal hormone use (never, ever), oral contraceptive use (never, past, current), intake (quintiles) of cereal fiber, magnesium, trans fat, polyunsaturated:saturated fat, and consumption of sugar-sweetened soft drinks, diet soft drinks, fruit juice, and fruit punch (other than the main exposure, depending on model). The data were based on Ref. [50]).

33.    A prospective cohort study of more than 43,000 African American women between 1995 and 2001 showed that the incidence of type 2 diabetes was higher with higher intake of both sugar-sweetened soft drinks and fruit drinks. After adjusting for confounding variables, those who drank 2 or more soft drinks per day (*i.e.*, 140-300 calories and 35-75 grams of sugar) showed a 24% greater risk of type 2 diabetes, and those who drank 2 or more fruit drinks per day showed a 31% greater risk of type 2 diabetes, than those who drank 1 or less such drinks per month.[26]

34.    A large cohort study of 71,346 women from the Nurses' Health Study followed for 18 years showed that those who consumed 2 to 3 apple, grapefruit, and orange juices per day (280-450 calories and 75-112.5 grams of sugar) had an 18% greater risk of type 2 diabetes than women who consumed less than 1 sugar-sweetened beverage per month. The data also showed a linear trend with increased consumption, as demonstrated below.[27]

[26] Palmer, J.R., et al., "Sugar-Sweetened Beverages and Incidence of Type 2 Diabetes Mellitus in African American Women," *Archive of internal Medicine*, Vol. 168, No. 14, 1487-82 (July 28, 2008) [hereinafter "Palmer, Diabetes in African American Women"].

[27] Bazzano, L.A., et al., "Intake of fruit, vegetables, and fruit juices and risk of diabetes in women," *Diabetes Care*, Vol. 31, 1311-17 (2008).

1
2
3
4
5
6
7
8
9
10
11
12



**Figure 1**—*Multivariate-adjusted relative hazard of diabetes by category of cumulatively updated fruit juice intake. Values were adjusted for cumulatively updated BMI, physical activity, family history of diabetes, postmenopausal hormone use, alcohol use, smoking, and total energy intake. For an increase of 1 serving/day of fruit juice, the multivariate-adjusted relative risk was 1.18 (95% CI 1.10–1.26; P < 0.0001).*

13    35.    An analysis of more than 40,000 men from the Health Professionals Follow-Up Study, a
14 prospective cohort study conducted over a 20-year period, found that, after adjusting for age and a wide
15 variety of other confounders, those in the top quartile of sugar-sweetened beverage intake had a 24% greater
16 risk of type 2 diabetes than those in the bottom quartile, while consumption of artificially-sweetened
17 beverages, after adjustment, showed no association.[28]

18    36.    In an analysis of tens of thousands of subjects from three prospective longitudinal cohort
19 studies (the Nurses' Health Study, Nurses' Health Study II, and Health Professionals Follow-up Study),
20 researchers found, after adjusting for BMI, initial diet, changes in diet, and lifestyle covariates, that increasing
21 sugary beverage intake—which included both sugar-sweetened beverages and fruit juice—by half-a-serving
22 per day over a 4-year period was associated with a 16% greater risk of type 2 diabetes.[29]

23    37.    In another study of subjects from the Nurses' Health Study, Nurses' Health Study II, and
24 Health Professionals Follow-up Study, researchers set out to "determine whether individual fruits are
25

26 [28] de Konig, L., et al., "Sugar-sweetened and artificially sweetened beverage consumption and risk of type 2 diabetes in men," *American Journal of Clinical Nutrition*, Vol. 93, 1321-27 (2011).

27 [29] Drouin-Chatier, J., et al., "Changes in Consumption of Sugary Beverages and Artificially Sweetened Beverages and Subsequent Risk of Type 2 Diabetes: Results From Three Large Prospective U.S. Cohorts of Women and Men." *Diabetes Care*, Vol. 42, pp. 2181-89 (Dec. 2019).

28

differentially associated with risk of type 2 diabetes," looking at the associated risk with eating three servings per week of blueberries, grapes and raisins, prunes, apples and pears, bananas, grapefruit, oranges, strawberries, cantaloupe, and peaches, plums and apricots, as well as "the same increment" in fruit juice consumption. They found that "[g]reater consumption of specific whole fruits" was "significantly associated with a lower risk of type 2 diabetes, whereas greater consumption of fruit juice is associated with a higher risk." The increased risk was approximately 8% based on three fruit juice servings per week.[30] Similarly, a meta-analysis of 17 prospective cohort studies showed higher consumption of fruit juice was associated with a 7% greater incidence of type 2 diabetes after adjusting for adiposity.[31]

38.     An econometric analysis of repeated cross-sectional data published in 2013 established a causal relationship between sugar availability and type 2 diabetes. After adjusting for a wide range of confounding factors, researchers found that an increase of 150 calories per day related to an insignificant 0.1% rise in diabetes prevalence by country, while an increase of 150 calories per day in sugar related to a 1.1% rise in diabetes prevalence by country, a statically-significant 11-fold difference.[32]

### D.     Sugar-Sweetened Beverage Consumption is Associated with Increased Risk of Liver Disease

39.     Sugar-sweetened beverage consumption causes serious liver disease, including non-alcoholic fatty liver disease (NAFLD), characterized by excess fat build-up in the liver. Five percent of these cases develop into non-alcoholic steatohepatitis (NASH), scarring as the liver tries to heal its injuries, which gradually cuts off vital blood flow to the liver. About 25% of NASH patients progress to non-alcoholic liver cirrhosis, which requires a liver transplant or can lead to death.[33]

---

[30] Muraki, I., et al., "Fruit consumption and risk of type 2 diabetes: results from three prospective longitudinal cohort studies." *BMJ* (Aug. 28, 2013).

[31] Imamura, F., et al., "Consumption of sugar sweetened beverages, artificially sweetened beverages, and fruit juice and incidence of sugar type 2 diabetes: systematic review, meta-analysis, and estimation of population attributable fraction." *BMJ*, Vol. 351 (2015).

[32] Basu, S., et al., "The Relationship of Sugar to Population-Level Diabetes Prevalence: An Econometric Analysis of Repeated Cross-Sectional Data," *PLOS Online*, Vol. 8, Issue 2 (Feb. 27, 2013).

[33] Farrell, G.C., et al., "Nonalcoholic fatty liver disease: from steatosis to cirrhosis," *Hepatology*, Vol. 433, No. 2 (Suppl. 1), S99-S112 (February 2006); Powell, E.E., et al., "The Natural History of Nonalcoholic Steatohepatitis: A Follow-up Study of Forty-two Patients for Up to 21 Years," *Hepatology*, Vol. 11, No. 1 (1990).

40.    Since 1980, the incidence of NAFLD and NASH has doubled, along with the rise of fructose consumption, with approximately 6 million Americans estimated to have progressed to NASH and 600,000 to Nash-related cirrhosis. Most people with NASH also have type 2 diabetes. NASH is now the third-leading reason for liver transplant in America.[34]

41.    Moreover, because the liver metabolizes sugar virtually identically to alcohol, the U.S. is now seeing for the first time alcohol-related diseases in children. Conservative estimates are that 31% of American adults, and 13% of American children suffer from NAFLD.[35]

**E.    Sugar-Sweetened Beverage Consumption is Associated with Increased Risk of Obesity**

42.    Excess added sugar consumption also leads to weight gain and obesity because insulin secreted in response to sugar intake instructs the cells to store excess energy as fat. This excess weight can then exacerbate the problems of excess added sugar consumption, because excess fat, particularly around the waist, is in itself a primary cause of insulin resistance, another vicious cycle. Studies have shown that belly fat produces hormones and other substances that can cause insulin resistance, high blood pressure, abnormal cholesterol levels, and cardiovascular disease. And belly fat plays a part in the development of chronic inflammation in the body, which can cause damage over time without any signs or symptoms. Complex interactions in fat tissue draw immune cells to the area, which triggers low-level chronic inflammation. This in turn contributes even more to insulin resistance, type 2 diabetes, and cardiovascular disease.

43.    Based on a meta-analysis of 30 studies between 1966 and 2005, Harvard researchers found "strong evidence for the independent role of the intake of sugar-sweetened beverages, particularly soda, in the promotion of weight gain and obesity in children and adolescents. Findings from prospective cohort

---

[34] Charlton, M.R., et al., "Frequency and outcomes of liver transplantation for nonalcoholic steatohepatitis in the United States," *Gastroenterology*, Vol. 141, No. 4, 1249-53 (Oct. 2011).

[35] Lindback, S.M., et al., "Pediatric Nonalcoholic Fatty Liver Disease: A Comprehensive Review," *Advances in Pediatrics*, Vol. 57, No. 1, 85-140 (2010); Lazo, M. et al., "The Epidemiology of Nonalcoholic Fatty Liver Disease: A Global Perspective," *Seminars in Liver Disease*, Vol. 28, No. 4, 339-50 (2008); Schwimmer, J.B., et al., "Prevalence of Fatty Liver in Children and Adolescents," *Pediatrics*, Vol. 118, No. 4, 1388-93 (2006); Browning, J.D., et al., "Prevalence of hepatic steatosis in an urban population in the United States: Impact of ethnicity," *Hepatology*, Vol. 40, No. 6, 1387-95 (2004).

studies conducted in adults, taken in conjunction with results from short-term feeding trials, also support a positive association between soda consumption and weight gain, obesity, or both."[36]

44.     A recent meta-analysis by Harvard researchers evaluating change in Body Mass Index per increase in 1 serving of sugar-sweetened beverages per day found a significant positive association between beverage intake and weight gain.[37]

45.     One study of more than 2,000 2.5-year-old children followed for 3 years found that those who regularly consumed sugar-sweetened beverages between meals had a 240% better chance of being overweight than non-consumers.[38]

46.     An analysis of data for more than 50,000 women from the Nurses' Health Study during two 4-year periods showed that weight gain over a 4-year period was highest among women who increased their sugar-sweetened beverage consumption from 1 or fewer drinks per week, to 1 or more drinks per day (8.0 kg gain during the 2 periods), and smallest among women who decreased their consumption or maintained a low intake level (2.8 kg gain).[39]

47.     A study of more than 40,000 African American women over 10 years had similar results. After adjusting for confounding factors, those who increased sugar-sweetened beverage intake from less than 1 serving per week, to more than 1 serving per day, gained the most weight (6.8 kg), while women who decreased their intake gained the least (4.1 kg).[40]

48.     Experimental short-term feeding studies comparing sugar-sweetened beverages to artificially-sweetened beverages have illustrated that consumption of the former leads to greater weight gain. As demonstrated in the chart below, one 10-week trial involving more than 40 men and women demonstrated that the group that consumed daily supplements of sucrose (for 28% of total energy) increased body weight

[36] Malik, V.S., et al., "Intake of sugar-sweetened beverages and weight gain: a systematic review," *American Journal of Clinical Nutrition*, Vol. 84, 274-88 (2006).

[37] Malik, V.S., et al., "Sugar-sweetened beverages and BMI in children and adolescents: reanalyses of a meta-analysis," *American Journal of Clinical Nutrition*, Vol. 29, 438-39 (2009).

[38] Dubois, L., et al., "Regular sugar-sweetened beverage consumption between meals increases risk of overweight among preschool-aged children," *Journal of the American Dietetic Association*, Vol. 107, Issue 6, 924-34 (2007).

[39] Schulze, Diabetes in Young & Middle-Aged Women, *supra* n.24.

[40] Palmer, Diabetes in African American Women, *supra* n.26.

and fat mass, by 1.6 kg for men and 1.3 kg for women, while the group that was supplemented with artificial sweeteners lost weight—1.0 kg for men and 0.3 kg for women.[41]

 

**FIGURE 2.** Mean (± SEM) changes in body weight, fat mass, and fat-free mass during an intervention in which overweight subjects consumed supplements containing either sucrose (●; $n = 21$) or artificial sweeteners (△; $n = 20$) daily for 10 wk. The diet × time interactions were significant for changes in body weight ($P < 0.0001$) and fat mass ($P < 0.05$) by analysis of variance with Tukey's post hoc tests. At specific time points for changes in body weight and fat mass, there were significant differences between the sucrose and sweetener groups: *$P < 0.05$, **$P < 0.001$, and ***$P < 0.0001$ (general linear model with least squares means and adjustment for multiple comparisons).

## F.   Sugar-Sweetened Beverage Consumption is Associated with Increased Risk of High Blood Triglycerides and Abnormal Cholesterol Levels

49.     Cholesterol is a waxy, fat-like substance found in the body's cells, used to make hormones, bile acids, vitamin D, and other substances. The human body manufactures all the cholesterol it requires, which circulates in the bloodstream in packages called lipoproteins. Excess cholesterol in the bloodstream can become trapped in artery walls, building into plaque and narrowing blood vessels, making them less flexible, a condition called atherosclerosis. When this happens in the coronary arteries, it restricts oxygen and nutrients to the heart, causing chest pain or angina. When cholesterol-rich plaques in these arteries burst, a clot can form, blocking blood flow and causing a heart attack.

50.     Most blood cholesterol is low-density lipoprotein, or LDL cholesterol, which is sometimes called "bad" cholesterol because it carries cholesterol to the body's tissues and arteries, increasing the risk of heart disease. High-density lipoprotein, or HDL cholesterol, is sometimes called "good" cholesterol

---

[41] Raben, A., et al., "Sucrose compared with artificial sweeteners: different effects on ad libitum food intake and body weight after 10 wk of supplementation in overweight subjects," *American Journal of Clinical Nutrition*, Vol. 76, 721-29 (2002) [hereinafter, "Raben, Sucrose vs. Artificial Sweeteners"].

because it removes excess cholesterol from the cardiovascular system, bringing it to the liver for removal. Thus, a low level of HDL cholesterol increases the risk of heart disease.

51.     Diet affects blood cholesterol. For example, the body reacts to saturated fat by producing LDL cholesterol.

52.     When the liver is overwhelmed by large doses of fructose, it will convert the excess to fat, which is stored in the liver and then released into the bloodstream, contributing to key elements of metabolic syndrome, like high blood fat and triglycerides, high total cholesterol, and low HDL "good" cholesterol.[42]

53.     A study of more than 6,000 participants in the Framingham Heart Study found those who consumed more than 1 soft drink per day had a 25% greater risk of hypertriglyceridemia, and 32% greater risk of low HDL cholesterol than those who consumed less than 1 soft drink per day.[43]

54.     A systematic review and meta-analysis of 37 randomized controlled trials concerning the link between sugar intake and blood pressure and lipids found that higher sugar intakes, compared to lower sugar intakes, significantly raised triglyceride concentrations, total cholesterol, and low density lipoprotein cholesterol.[44]

55.     A cross-sectional study among more than 6,100 U.S. adults from the NHANES 1999-2006 data were grouped into quintiles for sugar intake as follows: (1) less than 5% of calories consumed from sugar, (2) 5% to less than 10%, (3) 10% to less than 17.5%, (4) 17.5% to less than 25%, and (5) 25% or more. These groups had the following adjusted mean HDL levels (because HDL is the "good" cholesterol, higher levels are better): 58.7 mg/dL, 57.5, 53.7, 51.0, and 47.7. Mean triglyceride levels were 105 mg/dL, 102, 111, 113, and 114. Mean LDL levels were 116 mg/dL, 115, 118, 121, and 123 among women, with no significant trend among men. Consumers whose sugar intake accounted for more than 10% of calories had a 50% - 300% higher risk of low HDL levels compared to those who consumed less than 5% of calories from

---

[42] Te Morenga, Dietary Sugars & Body Weight, *supra* n.4.

[43] Dhingra, Cardiometabolic Risk, *supra* n.7.

[44] Te Morenga, L., et al., "Dietary sugars and cardiometabolic risk: systematic review and meta-analyses of randomized controlled trials on the effects on blood pressure and lipids," *American Journal of Clinical Nutrition*, Vol. 100, No. 1, 65-79 (May 7, 2014).

sugar. Likewise, high-sugar consumers had greater risk of high triglycerides. All relationships were linear as demonstrated in the charts below.[45]





**Figure 1.** Multivariable-Adjusted Mean HDL-C Levels by Level of Added Sugar Intake Among US Adults, NHANES 1999-2006

**Figure 2.** Multivariable-Adjusted Geometric Mean Triglyceride Levels by Level of Added Sugar Intake Among US Adults, NHANES 1999-2006

**Figure 3.** Multivariable-Adjusted Mean LDL-C Levels by Level of Added Sugar Intake Among US Men and Women, NHANES 1999-2006

56.     One experimental study showed that, when a 17% fructose diet was provided to healthy men, they showed an increase in plasma triacylglycerol concentrations of 32%.[46]

57.     Another 10-week experimental feeding study showed that those who were fed 25% of their energy requirements as fructose experienced increases in LDL cholesterol, small dense LDL cholesterol, and oxidized LDL cholesterol, as well as increased concentrations of triglycerides and total cholesterol, while those fed a 25% diet of glucose did not experience the same adverse effects.[47]

58.     In a cross-sectional study of normal weight and overweight children aged 6-14, researchers found that "the only dietary factor that was a significant predictor of LDL particle size was total fructose intake."[48]

[45] Welsh, J.A., et al., "Caloric Sweetener Consumption and Dyslipidemia Among US Adults," *Journal of the American Medical Association*, Vol. 303, No. 15, 1490-97 (April 21, 2010).

[46] Bantle, J.P., et al., "Effects of dietary fructose on plasma lipids in healthy subjects," *American Journal of Clinical Nutrition*, Vol. 72, 1128-34 (2000).

[47] Stanhope, K.L., et al., "Consuming fructose-sweetened, not glucose-sweetened, beverages increases visceral adiposity and lipids and decreases insulin sensitivity in overweight/obese humans," *The Journal of Clinical Investigation*, Vol. 119, No. 5, 1322-34 (May 2009).

[48] Aeberli, I., et al., "Fructose intake is a predictor of LDL particle size in overweight schoolchildren," *American Journal of Clinical Nutrition*, Vol. 86, 1174-78 (2007).

### G.   Sugar-Sweetened Beverage Consumption is Associated with Increased Risk of Hypertension

59.   An analysis of the NHANES data for more than 4,800 adolescents also showed a positive, linear association between sugar-sweetened beverages and higher systolic blood pressure, as well as corresponding increases in serum uric acid levels.[49]



Figure 1.
Sample mean of serum uric acid with 95% confidence intervals by categories of sugar sweetened beverage consumption adjusted for age, race/ethnicity, sex, total calories, BMI z-score, alcohol, smoking, dietary fiber intake, diet beverage consumption, and milk consumption. *P* for trend = 0.01

60.   In one study, 15 healthy men drank 500 ml of water containing either no sugar, 60 grams of fructose, or 60 grams of glucose. Blood pressure, metabolic rate, and autonomic nervous system activity were measured for 2 hours. While the administration of fructose was associated with an increase in both systolic

---

[49] Nguyen, S., et al., "Sugar Sweetened Beverages, Serum Uric Acid, and Blood Pressure in Adolescents," *Journal of Pediatrics*, Vol. 154, No. 6, 807-13 (June 2009).

and diastolic blood pressure, blood pressure did not rise in response to either water or glucose ingestion, as demonstrated in the chart below.[50]





Fig. 1. Time course of the systolic blood pressure (SBP; *A*), diastolic blood pressure (DBP; *B*), and heart rate (HR; *C*) changes (*left*) and mean responses (*right*) to drinking water (○), glucose (▲), and fructose (■). *P < 0.05 and **P < 0.01, statistically significant differences over time from baseline values (*left*) and differences between responses to the drinks (*right*).

61.     In another study, more than 40 overweight men and women were supplemented for 10 weeks with either sucrose or artificial sweeteners. The sucrose group saw an increase in systolic and diastolic blood

---

[50] Brown, C.M., et al., "Fructose ingestion acutely elevates blood pressure in healthy young humans," *Am. J. Physiol. Regul. Integr. Compl. Physiol.*, Vol. 294, R730-37 (2008).

pressure, of 3.8 and 4.1 mm Hg, respectively, while the artificial sweetener group saw a decrease in systolic and diastolic blood pressure, of 3.1 and 1.2 mm Hg, respectively.[51]

62.     Another study took a variety of approaches to measuring the association between sugar intake and blood pressure, concluding that an increase of 1 serving of sugar-sweetened beverages per day was associated with systolic/diastolic blood pressure differences of +1.6 and +0.8 mm Hg (and +1.1/+0.4 mm Hg with adjustment for height and weight), while an increase of 2 servings results in systolic/diastolic blood pressure differences of +3.4/+2.2, demonstrating that the relationship is direct and linear.[52]

**H.     Sugar-Sweetened Beverage Consumption is Associated with Increased All-Cause Mortality**

63.     In a cohort study of 13,440 black and white adults 45 years and older, observed for a mean of 6 years, each additional 12-oz serving per day of fruit juice was associated with a 24% higher all-cause mortality risk. This was significantly higher than the increased risk associated with *all* sugary beverages, including sugar-sweetened beverages like soda, which was 11% for each additional 12-oz serving per day. The researchers from Emory University, University of Alabama, and the Weill Cornell Medical College concluded their findings "suggest that consumption of sugary beverages, including fruit juices, is associated with all-cause mortality."[53]

**I.     Sugar-Sweetened Beverage Consumption Harms Gut Health**

64.     Added sugar consumption detrimentally affects gut health in multiple ways.

65.     First, as a recent scientific journal article explained, "high dietary sugar can have deleterious consequences [] by modulating microbiota."[54] This occurs through several known mechanisms. For example,

---

[51] Raben, Sucrose vs. Artificial Sweeteners, *supra* n.41.

[52] Brown, I.J., et al., "Sugar-Sweetened Beverage, Sugar Intake of Individuals, and Their Blood Pressure: International Study of Macro/Micronutrients and Blood Pressure," *Hypertension*, Vol. 57, 695-701 (2011).

[53] Collin, L.J., et al., "Association of Sugary Beverage Consumption With Mortality Risk in US Adults: A Secondary Analysis of Data From the REGARDS Study," *JAMA Network Open*, Vol. 2, No. 5 (May 2019).

[54] Satokari, R. "High Intake of Sugar and the Balance between Pro- and Anti-Inflammatory Gut Bacteria," *Nutrients*, Vol. 12, No. 5 (May 2020).

high added sugar consumption fosters the growth of harmful microbiota,[55,56,57] and halts the production of proteins that foster the growth of beneficial microbiota.[58] This "seems to stagger the balance of microbiota, by modifying the ratio of Proteobacteria and Bacteroidetes, to have increased pro-inflammatory properties, decreased immune-regulatory functions and decreased capacity to regulate epithelial integrity."[59]

66.    Second, another recent study showed that even "short term exposure to a high sugar diet increases susceptibility to colitis by reducing short chain fatty acids and increasing gut permeability."[60,61] The intestinal barrier is a functional boundary that protects the host from leakage of the intestinal microbiota or microbial metabolites into the circulatory system Fructose causes the loss of tight junction proteins, thereby increasing gut permeability and resulting in the translocation of bacteria and bacterial endotoxins

---

[55] Satokari, R. "High Intake of Sugar and the Balance between Pro- and Anti-Inflammatory Gut Bacteria," *Nutrients*, Vol. 12, No. 5, 1348 (May 2020)) [hereinafter "Satokari, High Intake of Sugar"] ("Recently, Do et al. investigated the effects of a high-glucose or -fructose diet on gut microbiota and intestinal permeability, as well as on blood endotoxin levels, inflammation and fat accumulation in a mouse model. High dietary sugar was found to drive changes in microbiota composition, specifically decreasing bacterial diversity and the abundance of Bacteroidetes and increasing the abundance of Proteobacteria. Concurrently, gut epithelium showed inflammatory changes and impaired integrity, and the animals developed metabolic endotoxemia and hepatic steatosis, while remaining normal-weight." (citing Do M.H., et al., "High-glucose or -fructose diet cause changes of the gut microbiota and metabolic disorders in mice without body weight change" *Nutrients*, Vol. 10, 761 (2018))).

[56] Mukhopadhya I., et al., "IBD-what role do Proteobacteria play?," *Nat Rev Gastroenterol Hepatol*., Vol. 9, No. 4, 219-30 (Feb. 2012).

[57] Scand J., "Contentious host-microbiota relationship in inflammatory bowel disease--can foes become friends again?" *Gastroenterol*., Vol. 50, No. 1, 34-42 (Jan. 2015).

[58] Townsend G.E., et al., "Dietary sugar silences a colonization factor in a mammalian gut symbiont," *Proceedings of the National Academy of Sciences* Vol. 116, No. 1, 233-238 (2019) (noting "fructose and glucose silence a critical colonization factor, called Roc, in a widely distributed gut commensal bacterium *B. thetaiotaomicron*").

[59] Satokari, High Intake of Sugar, Satokari R., *supra* n.55.

[60] Laffin, et al., "A high-sugar diet rapidly enhances susceptibility to colitis via depletion of luminal short-chain fatty acids in mice," *Scientific Reports*, Vol. 9, 12294 (Aug. 2019).

[61] Saffouri G.B., et al., "Small intestinal microbial dysbiosis underlies symptoms associated with functional gastrointestinal disorders," *Nat. Commun.*, Vol. 10, 2012 (2019) (a high simple sugar diet was found to increase small intestinal permeability in healthy humans).

into circulation. One recent study noted, that these findings "are consistent with recent literature purporting the risks of a high-sugar diet in the triggering and perpetuation of inflammatory bowel diseases."[62]

### J.     Because of the Compelling Evidence that Consuming Sugar-Sweetened Beverages is Unhealthy, Authoritative Bodies Recommend Limiting its Consumption

67.     The American Academy of Pediatrics (AAP) suggests limiting juice consumption to no more than 4 to 6 ounces for young children aged 1 to 6,[63] and no more than 8 fluid ounces for children 7 to 18 years of age, as well as adults.[64] In addition, both the AAP and Dietary Guidelines for Americans recommend that children consume whole fruit in place of juice.[65]

68.     The most recent Dietary Guidelines for Americans states that for children 2-18 sugar-sweetened beverages "are not necessary in the child or adolescent diet nor are they a component of the USDA Dietary Patterns. . . . Decreasing consumption of sugar-sweetened beverages to reduce added sugars intake will help youth achieve a healthy dietary pattern. Beverages that contain no added sugars should be the primary choice for children and adolescents."[66]

69.     The same 2020-2025 Dietary Guidelines for Americans note that "[m]ost adults' diets include choices across multiple food groups that are not in nutrient-dense forms and therefore cannot accommodate excess calories from sweetened beverages. Intake of sugar-sweetened beverages should be limited to small amounts and most often replaced with beverage options that contain no added sugars, such as water."[67]

---

[62] *Id*.

[63] Am. Academy of Pediatrics, "Healthy Children, Fit Children: Answers to Common Questions From Parents About Nutrition and Fitness." (2011).

[64] Heyman, M.B., et al., "Fruit Juice in Infants, Children, and Adolescents: Current Recommendations." *Pediatrics* Vol. 139, No. 6 (June 2017).

[65] *Id.*; *see also* Auerbach, B.J., et al., "Review of 100% Fruit Juice and Chronic Health Conditions: Implications for Sugar-Sweetened Beverage Policy." *Adv. Nutr.*, Vol. 9, pp. 78-85 (2018).

[66] U.S. Dep't of Health & Human Servs. and U.S. Dept. of Agric., "Dietary Guidelines for Americans 2020 –2025," at 87 (8th ed.), *available at* https://www.dietaryguidelines.gov/sites/default/files/2020-12/Dietary_Guidelines_for_Americans_2020-2025.pdf.

[67] *Id.* at 102.

70. The World Health Organization recommends that no more than 10% of an adult's calories, and ideally less than 5%, come from free or added sugar, or from natural sugars in honey, syrups, and fruit juice.

## III. DEFENDANT'S REPRESENTATIONS AND OMISSIONS SUGGESTING THE HEALTH-ADE BEVERAGES ARE HEALTHY ARE FALSE AND MISLEADING

71. For more than four years preceding the filing of this Complaint and continuing today, Defendant has sold and continues to sell the Health-Ade Beverages on a nationwide basis, including in California.

72. <u>Health-Ade Kombucha</u>. The standard serving size for Defendant's Health-Ade Kombucha products is 16 fl. oz. Each serving, depending on flavor, contains 12 to 17 grams of sugar (including 10 to 13 grams added sugar). The total and added sugar contribute, respectively, 60% to 91%, and 50% to 74% of the products' calories.

**73.** <u>Health-Ade Plus</u>. The standard serving size for Defendant's Health-Ade Plus products is 16 fl. oz. Each serving, depending on flavor, contains 13 to 17 grams of total sugar (including 12 to 13 grams added sugar). The total and added sugar contribute, respectively, 74% to 87%, and 60% to 74% of the products' calories.

74. <u>Health-Ade Booch Pop</u>. The standard serving size for Defendant's Health-Ade Booch Pop products is 12 fl. oz. Each serving, depending on flavor, contains 8 to 11 grams of total sugar (including 6 to 9 grams added sugar). The total and added sugar contribute, respectively, 73% to 90%, and 60% to 74% of the products' calories.

75. <u>Health-Ade pop</u>. The standard serving size for Defendant's Health-Ade Pop products is 12 fl. oz. Each serving, regardless of flavor, contains 5 grams of total sugar (all of it added). Depending on flavor, the sugar contributes 57% to 67% of the products' calories.

76. <u>Health-Ade Mixers</u>. The Health-Ade Mixer products' standard serving size is listed as 4 fl. oz. Each serving, depending on flavor, contains between 5 to 7 grams of total sugar, with between 5 to 7 grams of added sugar. The total sugar and added sugar contribute between 67% and 70% and between 60% to 70% of its calories, respectively.

77.     Because the scientific evidence demonstrates that sugar-sweetened beverage consumption is associated with increased risk of metabolic disease, cardiovascular disease, type 2 diabetes, liver disease, obesity, high blood triglycerides and cholesterol, hypertension, and all-cause mortality, Defendant's representations that the Health-Ade Beverages are a "Health-Ade" are false, or at least highly misleading.

78.     Even if the pro- or pre-biotics in the Health-Ade Beverages are capable of providing some benefit to gut health, because regular consumption of the products is likely to detriment overall health, it is still deceptive for Defendant to brand and market the products as "Health-Ade" which speaks to overall health and wellness, not just gut health.

79.     While representing that the Products promote or aid health, Defendant regularly and intentionally omits material information regarding the dangers of the free and added sugars in the Health-Ade Beverages. Defendant is under a duty to disclose this information to consumers because (a) it is revealing some information about the Health-Ade Beverages—enough to suggest they are healthy or beneficial to health—without revealing additional material information, (b) its deceptive omissions concern human health, and specifically the detrimental health consequences of consuming the products, (c) it was in a superior position to know of the dangers presented by the sugars in its products, as it is a food company whose business depends upon food science and policy, and (d) it actively concealed material facts not known to Plaintiffs and the Class.

## IV.     THE HEALTH-ADE BEVERAGES' LABELING VIOLATES CALIFORNIA AND FEDERAL LAW

80.     The Health-Ade Beverages and their challenged labeling statements violate California Health and Safety Code §§109875, *et. seq.* (the "Sherman Law"), which has expressly adopted the federal food labeling requirements as its own. *See*, *e.g.*, *id.* § 110100; *id.* § 110670 ("Any food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in Section 403(r) (21 U.S.C. Sec. 343(r)) of the federal act and the regulation adopted pursuant thereto.").

81.     First, the challenged "Health-Ade" claim is false and misleading for the reasons described herein, in violation of 21 U.S.C. § 343(a), which deems misbranded any food whose "label is false or misleading in any particular." Defendant accordingly also violated California's parallel provision of the Sherman Law. *See* Cal. Health & Safety Code § 110670.

82.    Second, despite making the challenged claim, Defendant "fail[ed] to reveal facts that are material in light of other representations made or suggested by the statement[s], word[s], design[s], device[s], or any combination thereof," in violation of 21 C.F.R. § 1.21(a)(1). Such facts include the detrimental health consequences of consuming the Health-Ade Beverages at typical levels, including increased risk of metabolic disease, cardiovascular disease, type 2 diabetes, liver disease, obesity, high blood triglycerides and cholesterol, hypertension, and death.

83.    Third, Defendant failed to reveal facts that were "[m]aterial with respect to the consequences which may result from use of the article under" both "[t]he conditions prescribed in such labeling," and "such conditions of use as are customary or usual," in violation of § 1.21(a)(2). Namely, Defendant failed to disclose the increased risk of serious chronic disease and death that is likely to result from the usual consumption of the Health-Ade Beverages in the customary and prescribed manners, including regular consumption of the standard serving size.

## V.    PLAINTIFFS' PURCHASE, RELIANCE, AND INJURY

84.    As best he can recall, Plaintiff Brandon Johnson-Jack purchased 16 fluid-ounce bottles of Health-Ade Kombucha during the Class Period approximately once or twice per month. Mr. Johnson-Jack would make his purchases from stores such as the Safeway located at 601 Westlake Center, Daly City, California 94015 and the Costco located at 1600 El Camino Real, South San Francisco, California 94080.

85.    As best he can recall, Plaintiff Michael Xavier has purchased 16 fluid-ounce bottles of Health-Ade Kombucha approximately one or twice per month, during the Class Period, with his most recent purchase being in early 2021. Mr. Xavier generally purchased Health-Ade Kombucha from local stores such as the Walmart located at 7010 Auburn Blvd., Citrus Heights, California 95621.

86.    When purchasing Health-Ade Kombucha, Plaintiffs were seeking beverages that were healthy to consume, that is, whose regular consumption would not increase risk of disease. In purchasing the Health-Ade Beverages, Plaintiffs were exposed to, read, and relied on Defendant's "Health-Ade" representation, which communicated to them that the products were healthy and would not detriment their overall health with regular consumption. This claim, however, was and is deceptive because the products do not aid health, but instead, their high sugar content makes their regular consumption likely to increase the risk of disease.

87.     Plaintiffs are not nutritionists, food experts, or food scientists, but rather lay consumers who did not have the specialized knowledge that Defendant had regarding the nutrients present in the Health-Ade Beverages. At the time of purchase, Plaintiffs were unaware of the extent to which consuming high amounts of free or added sugar adversely affects blood cholesterol levels and increases risk of metabolic disease, liver disease, heart disease, diabetes, all-cause mortality, and other morbidity, or what amount of sugar might have such an effect.

88.     The average and reasonable consumer is unaware of the extent to which consuming high amounts of free or added sugar adversely affects blood cholesterol levels and increases risk of disease, or what amount of sugar might have such an effect.

89.     Plaintiffs acted reasonably in relying on the challenged labeling claims, which Defendant intentionally placed on the Health-Ade Beverages labeling with the intent to induce average consumers into purchasing the products.

90.     Plaintiffs would not have purchased the Health-Ade Beverages if Plaintiffs knew that the "Health-Ade" claim was false and misleading in that the Health-Ade Beverages were and are not healthy, as represented.

91.     The Health-Ade Beverages cost more than similar products without misleading labeling, and would have cost less absent Defendant's false and misleading statements and omissions.

92.     Through the misleading labeling claims and omissions, Defendant was able to gain a greater share of the beverage market than it would have otherwise and to increase the size of the market.

93.     Plaintiffs paid more for the Health-Ade Beverages, and would only have been willing to pay less, or unwilling to purchase them at all, absent the false and misleading labeling complained of herein.

94.     Plaintiffs would not have purchased the Health-Ade Beverages if they had known that the products were misbranded pursuant to California and FDA regulations, or that the challenged claim was false or misleading.

95.     For these reasons, the Health-Ade Beverages were worth less than what Plaintiffs and the Class paid for them.

96.     Instead of receiving products that had actual healthful qualities, the Health-Ade Beverages that Plaintiffs and the Class received were beverages of the type that are likely to lead to increased risk of

disease when consumed regularly.

97.     Plaintiffs and the Class lost money as a result of Defendant's deceptive claims, omissions, and practices in that they did not receive what they paid for when purchasing the Health-Ade Beverages.

98.     Plaintiffs still wish to purchase healthy beverages, and continue to see the Health-Ade Beverages at stores when they shop. They would purchase Health-Ade Beverages in the future if the products were healthy, as represented, but unless Defendant is enjoined in the manner Plaintiffs request, they may not be able to reasonably determine whether the Health-Ade Beverages have been reformulated so that they are now healthy.

99.     Plaintiffs would purchase the Health-Ade Beverages if they could trust that the products' "Health-Ade" claim were true and not false or misleading, but absent an injunction, Plaintiffs will be unable to trust the representations or other similar health and wellness representations on the Health-Ade Beverages when Plaintiffs encounter them in the marketplace.

100.     Plaintiffs' substantive right to a marketplace free of fraud, where they are entitled to rely with confidence on representations such as those made by Defendant, continues to be violated every time Plaintiffs are exposed to the misleading labeling claims.

101.     Plaintiffs' legal remedies are inadequate to prevent these future injuries.

## CLASS ACTION ALLEGATIONS

102.     While reserving the right to redefine or amend the class definition prior to or as part of a motion seeking class certification, pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seek to represent a class of all persons in the United States who, at any time from four years preceding the date of the filing of this Complaint to the time a class is notified (the "Class Period"), purchased, for personal or household use, and not for resale or distribution, any of the Health-Ade Beverages (the "Class").

103.     The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all Class Members in a single action will provide substantial benefits to the parties and Court.

104.     Questions of law and fact common to Plaintiffs and the Class include:

a.     whether Defendant communicated a message regarding healthfulness of the Health-Ade Beverages through its packaging and advertising;

b.      whether that message was material, or likely to be material, to a reasonable consumer;

c.      whether the challenged claim is false, misleading, or reasonably likely to deceive a reasonable consumer;

d.      whether Defendant's conduct violates public policy;

e.      whether Defendant's conduct violates state or federal food statutes or regulations;

f.      the proper amount of damages, including punitive damages;

g.      the proper amount of restitution;

h.      the proper scope of injunctive relief; and

i.      the proper amount of attorneys' fees.

105.   These common questions of law and fact predominate over questions that affect only individual Class Members.

106.   Plaintiffs' claims are typical of Class Members' claims because they are based on the same underlying facts, events, and circumstances relating to Defendant's conduct. Specifically, all Class Members, including Plaintiffs, were subjected to the same misleading and deceptive conduct when they purchased the Health-Ade Beverages and suffered economic injury because the products are misrepresented. Absent Defendant's business practice of deceptively and unlawfully labeling the Health-Ade Beverages, Plaintiffs and Class Members would not have purchased them or would have paid less for them.

107.   Plaintiffs will fairly and adequately represent and protect the interests of the Class, have no interests incompatible with the interests of the Class, and have retained counsel competent and experienced in class action litigation, and specifically in litigation involving the false and misleading advertising of foods and beverages.

108.   Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small, such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them.

109.   Defendant has acted on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

110.   As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**Violations of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.***

111.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

112.     The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

113.    The acts, omissions, misrepresentations, practices, and non-disclosures of Health-Ade LLC as alleged herein constitute business acts and practices.

**Fraudulent**

114.    A statement or practice is fraudulent under the UCL if it is likely to deceive a significant portion of the public, applying an objective reasonable consumer test.

115.    As set forth herein, Health-Ade LLC's claims relating to the Health-Ade Beverages are likely to deceive reasonable consumers and the public.

**Unlawful**

116.    The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

•    The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*;

•    The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*;

•    The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*; and

•    The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 110100 *et seq*.

**Unfair**

117.    Defendant's conduct with respect to the labeling, advertising, and sale of the Health-Ade Beverages was unfair because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers, and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

118.    Defendant's conduct with respect to the labeling, advertising, and sale of the Health-Ade Beverages was and is also unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including but not necessarily limited to the False Advertising Law, portions of the Federal Food, Drug, and Cosmetic Act, and portions of the California Sherman Food, Drug, and Cosmetic Law.

119.    Defendant's conduct with respect to the labeling, advertising, and sale of the Health-Ade Beverages was and is also unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one consumers themselves could reasonably have avoided. Specifically, the increase in profits obtained by Defendant through the misleading labeling does not outweigh the harm to Class Members who were deceived into purchasing the Health-Ade Beverages believing they were healthy when in fact they are of the type that is likely to detriment health.

120.    Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised Health-Ade Beverages to unwary consumers.

121.    Plaintiffs and Class Members are likely to continue to be damaged by Defendant's deceptive trade practices, because Defendant continues to disseminate misleading information. Thus, injunctive relief enjoining Defendant's deceptive practices is proper.

122.    Defendant's conduct caused and continues to cause substantial injury to Plaintiffs and other Class Members. Plaintiffs have suffered injury in fact as a result of Defendant's unlawful conduct.

123.    In accordance with Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices, and to commence a corrective advertising campaign.

124.    Plaintiffs and the Class also seek an order for the restitution of all monies from the sale of the Health-Ade Beverages, which were unjustly acquired through acts of unlawful competition.

125.    Because Plaintiffs' claims under the "unfair" prong of the UCL sweep more broadly than their claims under the FAL, CLRA, or UCL's "fraudulent" prong, Plaintiffs' legal remedies are inadequate to fully compensate Plaintiffs for all of Defendant's challenged behavior.

**SECOND CAUSE OF ACTION**

**Violations of the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.***

126.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

127.    The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

128.    It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id*.

129.    As alleged herein, the advertisements, labeling, policies, acts, and practices of Defendant relating to the Health-Ade Beverages was likely to mislead consumers acting reasonably, as to the healthfulness of the products.

130.    Plaintiffs suffered injury in fact as a result of Defendant's actions as set forth herein because Plaintiffs purchased the Health-Ade Beverages in reliance on Defendant's false and misleading marketing claims stating or suggesting that the Health-Ade Beverages are healthful or are health aids.

131.    Defendant's business practices as alleged herein constitute unfair, deceptive, untrue, and misleading advertising pursuant to the FAL because Defendant has advertised the Health-Ade Beverages in a manner that is untrue and misleading, which Defendant knew or reasonably should have known, and omitted material information from the Health-Ade Beverages' labeling.

132.    Defendant profited from the sale of the falsely and deceptively advertised Health-Ade Beverages to unwary consumers.

133.    As a result, Plaintiffs, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendant was unjustly enriched.

134.    Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiffs, on behalf of themselves and the Class, seek an order enjoining Defendant from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

135.    Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA or commercial code (for Plaintiffs' breach of warranty claims), and restitution is not limited to returning to Plaintiffs and class members monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA and commercial code are more limited than the equitable remedies available under the FAL, and are therefore inadequate.

**THIRD CAUSE OF ACTION**

**Violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.***

136.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

137.    The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

138.    Defendant's false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of the Health-Ade Beverages for personal, family, or household purposes by Plaintiffs and Class Members, and violated and continue to violate the following sections of the CLRA:

　　　　a.    § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

　　　　b.    § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

　　　　c.    § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

　　　　d.    § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

139.    Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised Products to unwary consumers.

140.    Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

33

*Johnson-Jack v. Health-Ade, LLC*
CLASS ACTION COMPLAINT

141.    Pursuant to California Civil Code § 1782, more than 30 days before filing this lawsuit, Plaintiffs sent written notice of their claims and Defendant's particular violations of the Act to Defendant by certified mail, return receipt requested, but Defendant has failed to implement remedial measures.

142.    As a result, Plaintiffs and the Class have suffered harm, and therefore seek  (a) actual damages resulting from purchases of the Health-Ade Beverages sold throughout the Class Period to all Class Members, (b) punitive damages, (c) injunctive relief in the form of modified advertising and a corrective advertising plan, (d) restitution, and (e) attorneys' fees and costs.  *See* Cal. Civ. Code § 1782(d).

143.    In compliance with Cal. Civ. Code § 1780(d), an affidavit of venue is filed concurrently herewith.

### FOURTH CAUSE OF ACTION

### Breaches of Express Warranties, Cal. Com. Code § 2313(1)

144.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

145.     Through the Health-Ade Beverages' labeling, Defendant made affirmations of fact or promises, or description of goods, that, *inter alia*, the products are beneficial to health or are health aids.

146.    These representations were "part of the basis of the bargain," in that Plaintiffs and the Class purchased the Health-Ade Beverages in reasonable reliance on those statements. Cal. Com. Code § 2313(1).

147.    Defendant breached its express warranties by selling the Health-Ade Beverages that are not healthful, but rather contain high levels of sugar that are likely to increase the risk of chronic diseases, harming rather than promote bodily health.

148.    That breach actually and proximately caused injury in the form of the lost purchase price that Plaintiffs and Class Members paid for the Health-Ade Beverages.

149.    As a result, Plaintiffs seek, on behalf of themselves and other Class Members, their actual damages arising as a result of Defendant's breaches of express warranty, including, without limitation, expectation damages.

**FIFTH CAUSE OF ACTION**

**Breach of Implied Warranty of Merchantability, Cal. Com. Code § 2314**

150.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

151.    Defendant, through its acts set forth herein, in the sale, marketing, and promotion of the Health-Ade Beverages, made representations to Plaintiffs and the Class that, among other things, the Health-Ade Beverages are beneficial rather than detrimental to health and wellness.

152.    Defendant is a merchant with respect to the goods of this kind which were sold to Plaintiffs and the Class, and there were, in the sale to Plaintiffs and the Class, implied warranties that those goods were merchantable.

153.    However, Defendant breached that implied warranty in that the Health-Ade Beverages are not healthful, but are of the type that are generally harmful to health, as set forth in detail herein.

154.    As an actual and proximate result of Defendant's conduct, Plaintiffs and the Class did not receive goods as impliedly warranted by Defendant to be merchantable in that they did not conform to promises and affirmations made on the container or label of the goods.

155.    As a result, Plaintiffs seek actual damages, including, without limitation, expectation damages.

**<u>PRAYER FOR RELIEF</u>**

156.    Wherefore, Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, pray for judgment against Defendant as to each and every cause of action, and the following remedies:

a.    An Order declaring this action to be a proper class action, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' undersigned counsel as Class Counsel;

b.    An Order requiring Defendant to bear the cost of Class Notice;

c.    An Order compelling Defendant to conduct a corrective advertising campaign;

d.    An Order compelling Defendant to destroy all misleading and deceptive advertising materials and product labels, and to recall all offending products;

e.    An Order requiring Defendant to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;

f.      An Order requiring Defendant to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, or untrue or misleading advertising, plus pre-and post-judgment interest thereon;

g.      An Order requiring Defendant to pay compensatory damages and punitive damages as permitted by law;

h.      An award of attorneys' fees and costs; and

i.      Any other and further relief that Court deems necessary, just, or proper.

## JURY DEMAND

157.   Plaintiffs hereby demand a trial by jury on all issues so triable.


Dated: October 7, 2021                          /s/ Paul K. Joseph

**FITZGERALD JOSEPH LLP**
JACK FITZGERALD
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN
*trevor@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

***Counsel for Plaintiffs***

*Johnson-Jack v. Health-Ade, LLC*
CLASS ACTION COMPLAINT